May it please the court, this is a qualified immunity appeal brought by seven present or former law enforcement officers. And tell us which ones you're speaking on behalf of. Everyone except Ellington. In other words, Verrett, Celestial, Carter, Evans, Sims, and Halsey. All right. The initial inquiry in the qualified immunity analysis is whether the officer's conduct violated a constitutional right. If it did, the next step is to determine whether the right was clearly established in the specific context of the case. If the law was clearly established, the court must decide whether the officer's conduct was objectively reasonable. The conduct is measured with reference to the law as it existed at the time of the conduct. We've got all those basics down, so why don't you go to your specific points in the facts of the case. Yes, Your Honor. We hear, as you know, hundreds of these cases on the same standards. Yes, Your Honor. I first wanted to discuss the appellee's excessive force claim with you. To hold these officers liable, the appellees were required to prove that Herman Barnes suffered an injury, which was caused directly and only by the use of force which was clearly excessive to the need and the excessiveness of which was objectively unreasonable. The right to make an arrest carries with it the right to use some degree of physical coercion. Proper application of force in that context requires careful attention to the facts and circumstances of each particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers, and whether he is actively resisting or attempting to evade arrest by flight. However, not all of those factors must be present for the officer's actions to be reasonable. You look to the totality of the circumstances and judge a particular use of force from the perspective of a reasonable officer at the scene. In this incident, Deputy Verrett was the first officer on the scene who used force. He first grabbed Mr. Barnes' arm to restrain him from moving from the garage into the house. Barnes pulled his arm away. At that point, Verrett realized that Barnes was very strong. He repeatedly ordered Mr. Barnes to stop and get on the ground. Barnes ignored these orders. Verrett did not think it was safe to go hands-on with Barnes. Verrett is 5'7". Barnes was 5'11". He was alone with Barnes in a darkened house, and Verrett did not know if anyone else was present in the house, he might pose a secondary threat. Wasn't this in the middle of the day, though? It was, Your Honor, in the middle of the afternoon. But I believe the record reflects that the hallway inside the residence was darkened. I'm not trying to say that the entire house was darkened, but I believe that there was a hallway behind where they were struggling that was darkened. Verrett decided to use his taser to attempt to gain control over Barnes and handcuff him. The first time Verrett fired his taser, the probes did not come out of the cartridge at all and did not even touch Barnes. Verrett replaced the cartridge and pulled the trigger a second time. This time, the probes deployed, but one of them did not make contact or good contact. As a result, the circuit was not completed and no electrical charge was delivered. Verrett then touched the taser at Barnes' body to complete the circuit. However, Barnes was not incapacitated. Barnes then ran from the living room to the kitchen and started swinging his arms toward Verrett. Barnes struck Verrett on the shoulder. Verrett continued to try to force Barnes to get on the ground, and he then used his taser in drive-stun mode three times. Drive-stunning is used for pain compliance. It has no residual effect, and it appeared to have no effect on Barnes. Verrett then called for backup and employed leg strikes against Barnes. The leg strikes were ineffective. Barnes continued to be noncompliant with Verrett's orders and continued to struggle with Verrett. Verrett was dealing with an actively resisting suspect. In that circumstance, this court has recognized that use of substantial force is reasonable, and officers who use such force are entitled to qualified immunity. When appellants Celestial, Carter, Evans, and Hulsey encountered Mr. Barnes, he was actively resisting arrest during a struggle with Deputy Verrett. They had no information about Barnes or why he was being arrested. They were simply assisting an officer in distress and used the amount of force which was necessary to gain control over Mr. Barnes and take him into custody. The evidence showed that Mr. Barnes was combative and throwing punches. At one point, he raised the brass legs of a broken table up in the air. He was also kicking Deputy Carter in the shins and lower legs. Mr. Barnes was so strong that he was able to throw three deputies off of him. The evidence also showed that Barnes raised a chair up in the air as if he was going to hit one of the deputies with it. He simply refused to be handcuffed and resisted continuously. The tactics the deputies employed to overcome Barnes' resistance, such as baton strikes and closed fist strikes, were directed to noncritical areas of the body. There was no striking of the head. There was no striking of the throat. There were strikes to the back of the arm, back of the leg. Part of the time, he was only sitting in a chair. Is that right? That's true, Your Honor. When the confrontation within the House began, he was sitting in a chair. But he had already physically resisted Deputy Barrett before he sat down in the chair, and he would not comply with the orders. And as I was saying earlier, Deputy Barrett was very concerned about going hands-on with this man because he felt like that he was much stronger than he was, and he was right. Let's discuss a little bit the multiple times use of the taser. Are you contending that the taser was the minimum amount of force that was necessary, or only that although it wasn't the minimum amount, that it was still permissible within clearly established law? There's a difference. I'm just trying to understand what your contention is. Well, we certainly think that some of the taser strikes were definitely perfectly reasonable. But based on the existing law at the time, and we have to look at October 2006 to determine what was the law, it simply was not beyond debate that the use of the taser multiple times was excessive in any way. And if we look at the Supreme Court's opinion in Plumhoff v. Rickard from last year, the issue there was whether it was improper to fire shots into a vehicle in which the driver and passenger were killed, whether that was excessive. And the Court's position was if the threat continued to exist, then it was acceptable to continue to fire. If you could fire the first time, you could keep firing until the threat was ended. And in this instance, the taser was being used to try to overcome the continuing resistance and noncompliance. We cited to you a couple of cases from other circuits, because there's not very many of these cases. One from the Sixth Circuit and one from the Eleventh Circuit. That's the Hagins case out of the Sixth Circuit and the Hoyt case out of the Eleventh. Both cases involved deaths of suspects after a taser was used multiple times. The Courts concluded that the officers were entitled to qualified amenity in those cases. Now, Barnes' resistance and noncompliance clearly distinguishes this case from cases such as Newman v. Kidby. Newman claimed that he did not resist or fail to comply with a command. That created a material issue of fact. We don't have that here. There is no evidence in this record that Barnes did not resist or did not fail to comply with a lawful order. Once he's sitting on the chair, was there further resistance or ignorance of any orders that were given? I mean, what happened after he was sitting in the chair that caused further tasing? Well, when he's sitting in the chair, the first time the taser is used, it's not a use of force because the probes don't reach him at all. The second time the taser is used, it doesn't have any effect because the circuit wasn't completed. Then he completes the circuit by touching him, but he said it didn't have any effect on him. Then that's when Barnes starts fighting him aggressively, throwing punches, you know, punched the bread in the shoulder. Then they're in a physical struggle, and that continued throughout. That's when the tasers were used primarily. But after he's sitting down, did that continue? I mean, is he under control now, sitting down, and they continue to taser him? What happened after he's sitting down, or did all this occur before then? He comes in, he sits down. He's already used force against the deputy at that point. Then the deputy uses the taser a couple of times. While he's sitting in the chair? Did he ask him to get down or do anything? There's not any evidence that he—well, he told him to get down, yes. He commanded him repeatedly to get down. But I would submit to you that there can't be an excessive use of force when the taser doesn't even work. There has to be an injury. If there was no injury at that point, there can't have been an excessive force problem. And after he leaves the chair, he's in a violent struggle. There's certainly nothing wrong with the use of the taser at that point. With respect to the unlawful detention claim, we submit that Deputy Rett definitely had reasonable suspicion. He had seen—or he had spoken with the—I'm sorry, I ran out of time. You can give us 30 seconds on that issue. Deputy Rett had talked with the homeowners association president, I believe it was, who told him that there had been a problem with vandalism of the mailboxes in the area. He saw Barnes buy those mailboxes. He thought he ought to investigate. And Barnes looked at him, made direct eye contact, and walked quickly away. And because Deputy Rett was the contract deputy maintaining security in that subdivision, he felt like he needed to find out who is this guy. And then when he goes to talk to him, the guy can't tell him what his address is, even though he's standing right beside the house. Well, he's given inconsistent stories. He says he's from California, and then he says later that that's his house. Correct. All right. Thank you, Mr. Powers. You've saved time for about—Mr. Cobb? So how many years has it been, Mr. Cobb, about 30? I'd say—yes, Mr. Justice, about 30 years. Since I last saw you in a live hearing. All right. Good to see you here. Our hair was darkened. I think there have been some changes. That's right. Please, the Court, I represent George Ellington, and rather than, I guess, go over everything that was said before by my co-counsel, Mr. Powell, I'd like to point out that from the record in this case, when George Ellington entered the residence, there was at that point a scuffle going on between Mr. Barnes and three other officers. Now, under Texas law, Mr. Barnes was resisting arrest, and under Texas law, it's irrelevant whether the arrest that he was resisting was lawful or unlawful. He cannot refuse to resist arrest. So George Ellington was witnessing a crime taking place in front of him, and at that point he went over to assist the officers to get Mr. Barnes under control. That's when he first used his taser in what's called a dry-stun mode to try to get him on the back of his arm and up here at the solar plexus to get his arm out from under him so he could get it handcuffed. Mr. Barnes had one handcuff on him at that time, which the record reflects from expert witnesses that we call that that could be and has been used as a deadly weapon unless you can get that person under control. They can swing it around. I think the gravamen of the complaint that was from the plaintiffs' appellees in this case concerns the issue of how many times George Ellington deployed his taser. Was he the one that used 23 trigger pulls? Yes, Your Honor. It was roughly about 23 times. However, as we pointed out in the brief and as what was pointed out in the record, the number of times that one actually deploys the taser as opposed to the number of times you actually get a charge can vary. If the taser doesn't have a direct contact, if the prongs are too close together, these are things that can affect the taser actually delivering a shock. There's no way of knowing how many shocks actually were administered to Mr. Barnes. The only thing we can rely on in the record is that at certain times when officer at this way at certain times when the deputy was applying the taser, Mr. Barnes was still resisting, so therefore the taser wasn't being effective if it was delivering a current. We do know from the record that when Mr. Barnes was finally brought under control, it was through the last usage by Deputy Ellington of the taser, which resulted in Mr. Barnes finally complying. Once he complied, the taser was stopped at that point. I think, again— But he kept tasing him even though he was crawling away. He was on his hands and knees, right? I don't believe that. He was resisting during that time. They were trying to get him under control. Crawling away isn't necessarily complying with the order to put his hands behind his back. Here's a man who one officer was already injured. He had to leave because his hand was injured. The man, meaning Mr. Barnes, was still not complying with the orders. We had expert testimony, which the plaintiff's appellees never brought in any expert at this trial. We brought in experts to testify, and the record reflects that the use of the taser is in a continual force level, an intermediate level weapon. It's not a weapon that's quote-unquote lethal. It's less than lethal use of force. Well, I guess, I mean, my question went to whether the use of the taser was reasonable when the suspect was not standing and moving toward the officers but instead was at least taking the facts in the light most favorable to the plaintiff. He was not only moving away but crawling away. Yes, sir, it was reasonable, and it's reasonable for this reason. He has to be brought under complete control. Crawling away is not analogous to the cases that have been cited in the brief where the officer shot 15 times when the felon was still fleeing the scene. He still posed danger, and the Supreme Court said 15 times isn't excessive under the circumstances. Under these circumstances, Mr. Barnes was not allowed to resist. Under the law, he was supposed to comply with what the officers told him to do. He was supposed to allow himself to be handcuffed. Crawling away, running away, walking away is an active part of resisting that arrest, and therefore the use of the taser as a less than lethal means of force to place him under control is applicable under these circumstances. So although someone may say, well, gee, it seems kind of odd or whatever that a person crawling away doesn't pose a threat, he did pose a threat. He had one handcuff that he was manacled with, with the free end of it, able to swing. There's evidence in the record that even when he did crawl away and he got up, he at one point picked up a table leg. At another point, he had raised his hands in boxing stances and all that. The whole object of getting someone to be under control and placed in that position is to make sure is to make sure that that person is secured and that both handcuffs are on that individual. Otherwise, that would have continued. I had one question. Yes, Your Honor. Did Ellington see him throw the other three officers off of his back? Yes, he did, Your Honor. Yes, he did. That was why he, you know, and they tried to use the taser. And I might add just also that in the record, one of the other officers, when he did taser Mr. Barnes, Mr. Barnes literally pulled the prongs out and pulled the taser out of that officer's hand. So this was not a compliant interview. Thank you. All right. Thank you, Mr. Cobb. Yes, Kerry Bay. Of course, I represent Ruth Carroll, Herman Carroll, Sr., Chassidy Barnes, who is the executive of Herman Barnes' estate, and she's the guardian of Herman Barnes' two minor children, Maya and Jada. Mr. Barnes was in his neighborhood standing outside. It's debatable whether he was at any mailboxes or whether he was standing in front of his house or near the corner. It's close proximity. One witness came in, Angela Mitchell, and said she saw him on the corner. She saw the policeman turn around, and by the time she got close, and I guess she was driving, he was standing in front of his house. And the next time she said she saw him, he was on a stretcher coming out and looking like he was dead. The other witness, a man named Alton Johnson, testified that he saw Mr. Barnes. He had walked to the corner to get his nephew, the cousin, off the school bus, and he saw Mr. Barnes talking to the officer. He stopped and waved because he knew Mr. Barnes. He had played touch football with him or basketball or something in the neighborhood. He was familiar with him. He knew that Mr. Barnes was not a dangerous person because they played ball together. He did say that when Mr. Barnes was not on medicine, he talked to himself. And that's about what they could determine as far as Mr. Barnes' mental state. He talked to himself sometimes. But Mr. Barnes was standing there. The officer came back, turned around, and came back, according to one of the witnesses. Were these mailboxes that we're talking about, were they close to his house? Yes, Your Honor. I'm sorry to interrupt you. They're very close. I think he's like the second house off the corner, and the mailboxes are on the corner across the street. The witness who saw him didn't say he was across the street. She saw him, according to how I interpret her conversation at the trial, right near his house because she saw him walk to his house. Nobody said he ran. Deputy Verrett didn't say he ran. So I don't know that there's any fleeing or hot pursuit or any of that because he didn't run. Deputy Verrett asked Mr. Barnes where did he live. He told him, I live here. This is my house. Well, but before that, he said, I'm from California. Well, he had lived in California. His mother testified. She was in California then working. At one point, the family moved to California. Okay, but we're looking at things from, I mean, that background is interesting, but we're looking at things from the perspective of an officer who arrives on the scene, and we know what, we look at what the officer saw and heard, and the officer saw someone near some mailboxes. They'd gotten, correct me if I'm getting the record wrong. I'm just saying some things here so you can respond. So the law enforcement had gotten information that there had been maybe just that week that there had been vandalism of the mailboxes and in the neighborhood, and the officer arrives and Mr. Barnes tells him that he's from California and doesn't indicate right away where his house is. According to the transcript, Mr. Barrett asked Mr. Barnes where he lived, and he told him this is my house, I live here. Then he asked him again. I don't know if he asked him where he was from, but Mr. Barnes said, well, I'm from California. He did say I'm from California, but this is my house. Mr. Barrett didn't ask Mr. Barnes his name. He didn't ask him for any ID. Those are the first two things, according to the Sheriff's Department's policy, that you're supposed to find out. Who is this person? And he claims that Mr. Barnes did not know his address because Mr. Barnes was standing by the mailbox in front of the house, and he looked at the mailbox and looked at the address. The jury could have thought that Mr. Barnes is saying, well, you're asking me, well, here's the address. It does not mean that he did not know the address, and the jury should be able to look at that and determine that. Now, Mr. Barnes' sister was actually the woman that he lived with at that house. When Mr. Barnes thought he was having a consensual conversation, and you do look at that from the perspective of the innocent person, he thought he was free to leave. He answered the questions that he could. He walked around to leave. If it were a consensual conversation, he should have been able to leave and go into his house. He didn't have to answer any questions, the address or anything else, but he tried to see what the officer wanted, so he's free to answer questions or not. And in 45 seconds, Mr. Verrett said that he developed a reasonable suspicion, a reasonable suspicion that a criminal act was afoot. As I understand the record, again, I'm saying this so you can correct me if I'm wrong, that Mr. Barnes was unable to tell the officer what the address was of the house. It wasn't that he was unable to. It was that he didn't. He did not tell him, but he did not have to tell him. He didn't have to answer any questions. Under Terry, this was a consensual stop. He was free to leave, free to answer questions, free not to answer questions. From the perspective of an innocent person, this was, you know, objective. It was objectively reasonable to him. He didn't have to answer. We need to look at it from the perspective of a reasonable police officer. The reasonable police officer, Verrett, testified that Mr. Barnes was free to leave, that this was a consensual stop. He didn't say it was a detention at that point. He said it was consensual. If it were consensual, then Mr. Barnes should have been free to leave, which is what he did. He turned to leave. He went and he opened the garage. Mr. Verrett followed Mr. Barnes. He says he told him to stop. One of the witnesses, Alton Johnson, did not hear that. He could hear Mr. Barnes, when he got into the house, say, please, sir, get out of my house. But Mr. Barnes went and opened an attached garage. This was not something sitting on the side for public to come in and out. It was a garage attached to a house. He opened that attached garage. He knew he could open that garage, and he went on in the house. Mr. Verrett says he followed him because he didn't know that was his house. Well, he went in, and that was not the front door. Mr. Verrett did not knock and announce police, but he said he thought there were people, maybe people inside that could be harmed, but he never asked when he got in there, and he didn't knock. His entry was illegal. He should have knocked and announced police, and he could have seen whether anybody was in there. Then his exigent circumstance would have gone away. And so the detention, we believe, was triggered the fourth, and that it was unlawful. That there was no reasonable suspicion, and that the jury should be able to look at that. The magistrate in his recommendation on summary judgment thought that there were issues of fact for the jury. The case went to a jury. The trial judge, when the jury hung, the trial judge denied a motion for judgment as a matter of law because he says there are fact issues here for the jury, and we believe those fact issues are material, and they take the jurisdiction of the Court of Appeals away because the jury needs to decide these material issues of fact. One, with the excessive force, was it objectively reasonable for them to do what they did to Mr. Barnes? Well, that's a question of fact, the objective reasonableness of what they. Let's assume that we get past the chair, sitting in the chair, but at what point an officer says get up or get down, put your hands behind your back, and the person does not comply? What is the officer supposed to do to get compliance? Even if the entry into the house was unconstitutional and he wrongfully arrested him, but you can't resist arrest and you've got to comply when you're told you're under arrest, what can an officer do to get compliance? Well, he could talk to the man. Well, he said put your hands behind your back repeatedly, he doesn't do it. Then what is the officer authorized to do? Well, he's authorized to try to get him under control, but I don't think that means that you stand back, you say get on the floor, a person's sitting down, they're not causing any problem at all, and then you pull out a taser and you shoot them two or three times. I don't think that in the Sheriff's Department policy they should start with that continuum of force that they talked about. It talks about other things that happen before you use a chemical weapon if a person is just noncompliant, which is different from resisting. If you're noncompliant, what is the officer authorized to do? He's authorized to go through the continuum and use the appropriate level of force. Which is what? Starting with what? Well, I know that one of them is called soft hand, and forgive me if I don't know it all, but soft hand, and I guess that's when you try to get them on the floor or try to get their hands behind their back. But as far as pulling out the taser, there are things that they were supposed to do. You talk to them, you try to reason with them, and then you use the open hand or soft hand kinds of tools, and then you go to the other tools, the intermediate type tools like the taser. But none of that happened, and Mr. Barnes was not resisting by sitting in a chair. That's not resisting arrest. Once the officers were on him physically and he threw all three of them off, then what? He didn't throw all three of them off. That was what it turned out. There's a question of fact about that. What's the other evidence? Mr. Sims, who was – Mr. Barrett, call for backup. The first officers to get there was Sims and Celestial. Celestial says he walks in. He says Barnes is up. Sims says Barnes is in the chair. So first of all, we don't know where Barnes is. The jury needs to find that out. And then Sims says that he gave a drop kick to Mr. Barnes' stomach. Celestial came in, and he beat him five or six times with a stick, arms, legs, ankle, drop kick in the stomach. Barnes went down. He went down with one hand up under him and one handcuff on one of the hands. The officers had him down. They were working to get that hand to handcuff him. Mr. Ellington walked in. He leans over the other officers and shoots Mr. Barnes with a drive stone, which is putting that taser right up against your body so that you feel the full effect of whatever is going on with it. But he did it, and he shot him in the arm, and then he shot him in the neck. That's against their policy to do any kind of force on your head, your neck. But anyway, he shot him here, and Mr. Barnes defecated on himself. And he lost control of his bodily functions with that tasering. When that happened, Mr. Sims was at his feet. Mr. Verrett was on one side. Mr. Celestial was on one side. Mr. Ellington was over him. Mr. Sims said that Mr. Barnes threw him off because he was on the feet, but he said the others weren't really on him. He got up. But as far as having this superhuman strength to throw, in Mr. Sims' testimony at trial, that's in the record, he said that he was the only one that was really thrown off, and he didn't have all of his weight on Mr. Barnes. Am I correct that the record reflects that Mr. Barnes weighed about 165? Mr. Barnes weighed 165. Mr. Sims weighed two-something. Mr. Ellington weighed 250. Mr. Barnes at that point had over 800 pounds on him, approximately. And so that didn't really happen, but he did get up. And when he got up, that's when Mr. Ellington started tasering him. While he was down, Mr. Verrett was hitting him in the shoulder with his stick. Ellington got up, and Mr. Verrett had his gun on him when Mr. Sims and Mr. Celestial walked in. He had a gun on him, and Barnes was sitting in the chair. So did they have to do—was it reasonable? Would a jury think that was reasonable for Celestial, Ellington, and the rest of them to come in there and do the things that he did? I assume you would agree with me, but if you don't, you're free to tell us you disagree, that the law doesn't require that the officers do the very least possible to effect the arrest, but only that it can be reasonable. It doesn't have to be the minimum. I read somewhere in there, I think it's Exhibit No. 8, about the minimum, starting minimally. I think that I read that, or I saw it somewhere, but I believe it was in there, Exhibit 8, and that it was when— We're talking about constitutional standard, the constitutional standard. As far as— You don't have to use the least amount of force, but it has to be reasonable. It has to be reasonable, that's correct. That is the constitutional standard. Reasonable does not equal the least amount of force. It depends on the circumstances of the case. It depends on the circumstances, the severity of the crime that you're talking about. What was the crime? We really don't have a crime that Mr. Barnes committed. Resisting arrest under Texas law. And that's—what do you mean, when he was in the house sitting in the chair? At any time, when they were there. Well, was he really resisting? The taser policy says—I mean, the taser warnings say, you don't always fall down when you're tasered. Sometimes you freeze and you freeze. It will make you incoherent. Sometimes you just freeze. The way that he was being tasered and hit, how did he have a chance to resist anything? I meant, think about it. He was hit so many times by so many people. And then finally, when Ellington shot him with the taser, and he fell back and either broke the table or fell in between the table, they kept tasering him. And then, I think it was Halsey came over and started beating him with a stick. Carter pulled a gun on him and said, okay, drop this leg of the table. I don't know if he grabbed it, why he grabbed it. But Carter told him to drop it. He dropped it. But the officer, objectively, would think that he picked up this metal leg of a table to, in some way, assault the officer or resist what the officers were trying to do. He was on the floor, Judge Smith. I know, but we can't read out of the record the fact that Mr. Barnes picked up a metal table leg and tried to use it in some way. Well, that was in the record. The officers did testify about that, some of them, about the table leg, and that he was scooting on the floor on his butt, excuse me, and that he had been tased by Ellington numerous times at that point and Evans. Evans doesn't remember Mr. Barnes pulling a taser wire out of his chest. Nobody talked about this superhuman strength. I think that was only Carter or a boxing stance. What we did learn from the testimony is that he was screaming and yelling and screaming, like them said, a psychotic yell. When he was standing outside his house, Mr. Barrett said that he looked abnormal, incoherent. The jury could think that he knew he was around somebody who might not know his address. He didn't say the guy looked drugged. The autopsy report shows that Mr. Barnes had puncture wounds to his neck, chest, right nipple, left chest. As other puncture wounds are pointed out in autopsy photos, 24, 25, 26, shows other injuries to his wrists, back, knees, bruising bands, blunt trauma to his neck, which was really, and then he had black eyes, both ears, lip, mouth, gums inside the cheeks. He was beating from head to toe. So we're not talking about just taser cases. We're talking about excessive force, period, tasers, beatings, kickings. Was there any evidence that he was hit or tasered after he was handcuffed? Yes. Mr. Ellington did a final tasing when Mr. Barnes was on the kitchen floor. They were, I think, trying to get him handcuffed or whatever, but he was there. He had been Ellington and Carter. Carter went over and gave him some kidney punches in the side. He said he got off some really hard ones. And Ellington continued to tase until Mr. Barnes was nonresponsive. And that violates taser's policies, Exhibit Number 88. All right. We've asked you a lot of questions. If you had anything else, I'll give you one more minute if there's anything else that you wanted to mention to us. If you've covered everything, that's fine, too. All right. I think I covered pretty much everything except there was an issue that was one of the issues in the brief concerning waiver. And I didn't, I'm substituting in, so I didn't write the brief, but the waiver argument is there. I do know that you can appeal a JMOL, and you can appeal from, but the argument there was a Martin case, that's still law, that says if you don't appeal the magistrate's ruling, and in that case they didn't object to the magistrate's ruling. The case went on to trial, and then they tried to bring up the qualified immunity at that point. And so that case says, well, you didn't do that with the magistrate's ruling, so you can't do it now. Now, I do know that there are, the Rule 50D, if you do that motion, you should be allowed to appeal it. But in our case, we had a mistrial. And in our case, we had a JMOL that was denied. So it's an open, until they appealed it, the defendants, the trial judge didn't have any final decision. I think some of the law might say that ruling on a qualified immunity is a final decision, but it was not a, it was the, the JMOL was denied. And so we don't, the cases, all the cases I read had to do with summary judgment, and I looked very hard. All right. Thank you, Ms. Carrie Bain. We do know that you're substituting in. We appreciate your willingness to do that. Okay. Thank you, Brian. I appreciate y'all's time. Mr. Powers, you've saved time for a vote. The most important thing to say right now is there is no evidence whatsoever in this record that Mr. Barnes was tasered after he was fully handcuffed. That simply didn't happen. He had one handcuff on during the melee, but the tasing completely stopped as soon as that second handcuff was secured. Okay. And we'll check the record on that so you can move on to whatever else you have. Yes, sir. There's also no dispute in this record that Mr. Barnes was able to throw three officers off of him. Let me ask you a question about the entrance because we didn't talk about that very much when you were up here last. What was the exigent circumstance when Mr. Barnes entered that back door into the home? Why wasn't there time to go get a warrant? Brett testified that his concern was that he didn't think that this was necessarily Mr. Barnes' house because he'd already asked him where he lived and he told him he was from California. Then he asked him, you know, then Mr. Barnes tells him this is my house. But then when he asked him what's the address, Mr. Barnes doesn't seem to know, and he starts looking at the mailbox as if he's trying to figure out what the address of the house is. And Brett felt that he should, anybody who lives in the house should know what the address is. So his concern was this could be somebody else's house. There could be somebody who's at risk inside that house. Once he got in there, did he call out and ask anybody else home? I don't think the record reflects that he called out. If he did, I don't recall it. Is it, what, 3 or 3 o'clock, 3 or 3.30 in the afternoon? Yes. Right. But remember that at that point, Brett had already ordered Barnes to stop before he went in. And he grabbed Barnes' arm and Barnes forcibly pulled his arm away. At that point, he had exerted force against the deputy. There was no use of a taser prior to that point in time. There was a remark made about that it's improper to tase the neck area. As I recall, the expert witness for the defense in this case testified that that is an acceptable place to do a drive stunt. It's in the brachial part of the neck. Was there conflict in the evidence on that? I don't believe so, no. The plaintiff didn't offer any expert testimony. With respect to the question of what can an officer do if the subject is noncompliant, he can use whatever level of force on the continuum that is reasonable under the circumstances. And you have to look at the total circumstances. What has already happened? What is happening now? That governs what level of force he can use. There was a comment made that he should have knocked and announced. Barnes has already been talking to him. Why would you knock and announce before going in the house when the subject has already been contacted outside the house? All right. Your time has expired, Mr. Powers. Your case is under submission. Thank you. The court will take a brief recess.